LOUISE N. SHAW and Another, Plaintiffs, *v.* THE CITY OF NEW YORK and Another, Defendants.

Supreme Court, Special Term, Bronx County, December 20, 1937.

*Rao, Liggia & Cannella*, for the plaintiffs.

*Paul Windels, Corporation Counsel*, for the defendant City of New York.

*Arthur Berliner*, for the defendant Carl Borner.

McGEEHAN, J. This application for a new trial presents a problem of vital importance to the city of New York as well as to the other parties to this litigation. On December 17, 1934, Louise N. Shaw and Harry J. Moore, the plaintiffs herein, were standing in a "safety zone" designated by stanchions at East Tremont avenue and Taylor avenue in the borough of Bronx, city of New York, at about the hour of seven P. M., at which time it was dark. The stanchions allegedly did not have lights upon them.

While standing in the safety zone waiting for a trolley car, an automobile driven by one Carl Borner ran into one of the stanchions and caused serious physical injuries to the plaintiffs as a result. The plaintiffs instituted action against the driver of the car for his negligence in the operation of the car and the city of New York for its negligence in the maintenance of the stanchions without lights at that time of night.

At the close of the entire case the city of New York made a motion to dismiss the complaint upon the ground that the duty of the city of New York to regulate traffic on public highways is a governmental function for which the city should not be held liable in damages. The authority for this motion was the case of *Parsons* v. *City of New York* (248 App. Div. 825), which was affirmed in the Court of Appeals (273 N. Y. 547). In that case the court held that the operation of signal lights was a regulation of traffic which was a governmental duty, for the neglect of which the city should not be held liable.

The difference between the two cases is that the *Parsons* case dealt with a *defective* signal light and the case before this court deals with a stanchion in the highway in the night *without a light*. This court applied the principle of the *Parsons* case and dismissed the complaint as to the defendant city. The plaintiff Louise N. Shaw recovered a judgment of $5,000 against the other defendant, Carl Borner, and the plaintiff Harry J. Moore recovered a judgment of $500 against this same defendant as a result of the jury's verdict.

In disposing of the city's motion to dismiss the complaint, this court was not unmindful of the fact that if the city were held responsible for every defective light stanchion and pedestal signal, as they now exist, the consequences to the city would be very serious.

However, since the disposition of this matter the Appellate Division of the Second Department, in the case of *Murphy* v. *Incorporated Village of Farmingdale* (252 App. Div. 327, 329), has unanimously held that " The complaint tenders an issue of fact as to whether or not the traffic control stanchion and concrete base upon which it was set was unreasonably dangerous to motorists as a consequence of the structure's creating an unreasonably unsafe street condition in connection with the lack, if any, of illumination thereof or other warning sufficient reasonably to apprise motorists traveling on the highway of the existence and extent of the structure."

This statement by the learned justices of the Appellate Division clearly shows a disposition to hold the defendant accountable for its action in matters concerned with traffic control and regulation on the public highways and to definitely limit the immunity granted

under the ruling in the *Parsons* case. The *Farmingdale* case is not against the city of New York and the provisions of the New York City Charter are not applicable, but the logic and reasoning of that case, if extended to matters involving New York city, will result in far-reaching consequences to New York city.

Statistics show that in the First Judicial Department of the State of New York seventy-five per cent of the litigation in the Supreme Court arises out of traffic accidents. Every year this court adjudicates claims aggregating hundreds of millions of dollars.

Having served many years as a magistrate in the various traffic courts of the city of New York, I find that, as a justice of the Supreme Court, the issues presented are the same as those presented in the Magistrates' Court, namely, violations of the rules of the road, speeding, dangerous driving, automobile assaults and homicides and charges of driving while intoxicated.

The greatest difference seems to be in the judgment pronounced by the court. In the Magistrates' Court the judgment is for a fine or imprisonment, whereas in the Supreme Court the judgment is usually for damages. In considering the type of litigation that preponderates in the Supreme Court of this Department, it is safe to say that it is the greatest traffic court in the State. During the last few years the control of traffic in New York city has become a major problem in determining liability for injuries and property damage.

The question as to the visibility of traffic lights and signs and their location enters into almost every automobile accident case today. In many instances these signals are responsible for misleading the parties concerned in the accident, but the city avoids liability upon the doctrine expressed in the *Parsons* case.

The erection and the operation of a traffic control system in a city ike New York should not be intrusted to unqualified men. This function requires the services and ingenuity of highly-trained engineers who are specialists in this particular field of endeavor and who can best protect the city from possible liability. No longer is the officer on beat or his superior qualified to cope with this situation simply because at one time he had the power and ability to disperse a crowd or to keep traffic moving at a certain locality.

No matter how proficient he may have become at dispersing crowds or keeping traffic moving, he is unqualified to cope with modern demands and requirements. Certainly, if the city is to remain immune from suit in matters pertaining to the control of traffic, it owes to the taxpayers as well as to non-taxpayers the duty of seeing that New York city has at least protected them with a system that is modern, scientific and safe.

Otherwise, the courts will be loath to grant immunity to a city that flagrantly flaunts scientific safeguards and experiments with untried devices of untrained, unskilled and unqualified men in this field.

The Federal government has issued a publication entitled " Manual on Uniform Traffic Control Devices," which was prepared by the American Association of State Highway Officials and the National Conference on Street and Highway Safety. It is a most noteworthy treatise on signals, street markings and road building, and should be studied carefully by those in authority.

One purpose is to set a uniform standard for the nation on these very important matters so that the motorist may drive under uniform signals, signs and laws throughout the country. This necessity for uniform standards of signals and signs is beyond debate. State after State has complied with the standards set by this conference, among which is our Empire State of New York. But when we view conditions in our city we find that New York city may establish standards independent of the State.

While there are sound reasons for the doctrine of home rule, there are no sound reasons why New York city should set up standards of signal lights and signs condemned by the experts of the State of New York and the nation. However, the city of New York has acted in a most arbitrary and unintelligent manner in this respect.

Almost daily this court hears utterances that " the traffic light was behind a tree and was not visible to me but was to the other side." The jury must consider problems that add considerably to their burdens and that would be entirely eliminated if New York city's traffic control system was modernized and made adequate to the present-day needs.

Often the defense is interposed that the traffic signal lights were obliterated by a background of many other lights. When we consider that the present inadequate traffic control system of the police department has no fixed standard for the height, placing or timing of its signal lights, it is not surprising when litigants testify to the fact that they searched both sides of the highway for the signal light and in their search they neglected to keep their eye on the road in front of their car.

It is a fact that some signal lights are suspended on independent poles of varying heights from eight to twenty-two feet; others are attached to city lighting poles; many signal lights are far inside of the curb line, while others are suspended from arms extending over the street, and many are not within the driver's direct line of vision, compelling him to search for the signal light.

It is, furthermore, a fact that some signal lights in New York city flash from red directly to green while others flash from red to blank and then to green. During the dark spot there is an absence of any signal that creates confusion. The dark spot is certainly not a worthy or desirable substitute for the " yellow light " of caution so generally adopted elsewhere.

The placing of the lights in New York city is certainly most irregular and unscientific, to say the most complimentary thing that can be said about that phase of the traffic control system.

Another phase that merits mentioning is the policy of the police department of the city of New York to maintain signal lights on pedestals erected in the center of the road, despite the sweeping condemnation of this practice by all safety experts.

Very recently, while traveling just north of the elevated structure on Jerome avenue at the entrance to Woodlawn Cemetery in the borough of Bronx a driver crashed into a pedestal that was erected in the center of this 100-foot roadway and was killed as a result. The light on the pedestal was shut off because the cemetery gates were closed, although the darkness of night made this obstruction on the highway without a light at that time an unnecessary hazard, to say the least, to people lawfully using the highway.

The impact caused damage to the pedestal as well as death to the driver. His blood was not dry on the pavement when the signal pedestal was re-erected on the very same spot. Does the city expect the court to be blind to the fact that the pedestal in question is a dangerous obstruction on the highway of which the city now should have ample notice, or will the city still claim immunity upon the theory that the regulation of traffic is a governmental function?

That shield of immunity should be used only when the city has performed its duty to the best of its ability and has not delegated this most important responsibility to policemen with no scientific knowledge or education other than their experience on the police force.

In passing, it is well to comment upon the fact that the traffic signs in New York city are not uniform in size, shape or color, and that the same are unreadable in the day time and invisible at night. The signs purporting to give directions to travelers are entirely unsatisfactory for the purpose.

The immunity that the city seeks from liability for the injuries to others is without merit under conditions now existing, but the abrogation of the rule as formulated by the Court of Appeals must not be made by this court of original jurisdiction.

The motion to set aside the judgment and for a new trial upon the grounds specified must be denied. This court, not unmindful of the countless problems that torture the thoughts of our executive officials, feels certain that his honor, the mayor of the city of New York, and his worthy police commissioner, ever alert to the best interests of New York city, will find time to cause a survey of our present defective traffic control system to be made by the greatest experts in the nation on that particular subject.

It seems incongruous that a national congress of the greatest experts on safety devices should meet in serious conference and after years of study and experiment declare their unanimous opinions in official reports, and then have their research and conclusions ignored simply because a group of minor police officials have been given that power and are in a position to spend millions of dollars of the taxpayers' money on their own experiments.

When the standardization of the street lighting system in New York city was in issue, this court, in its capacity as an official of the department of water supply, gas and electricity, advocated the use of the highest standards known to science. Today, when New York city is confronted with the standardization of traffic control, the same formula is applicable.

In maritime and railroad law the erection of defective or faulty signal equipment is forbidden under very severe penalties. But in dealing with the public highways in New York city the People are denied " the highest standard known to science " and are instead given the unscientific, unskilled regulations of the police department that will eventually, if permitted to continue, result in very serious consequences to New York city.